IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

IN RE:   AKSM HOLDINGS, INC.                               Case No. 09-51148
         DEBTOR                                            Chapter 11

**MOTION TO ESTABLISH BIDDING
AND SALE PROCEDURES UNDER 11 U.S.C. §§363 AND 105**

COMES NOW AKSM Holdings, Inc., Chapter 11 Debtor and Debtor In Possession ("Debtor" or "Estate" or "Seller"), who asks this Court to approve the bidding and sale procedures for certain of the Debtor's assets, subject to final confirmation of the sale, and would show unto the Court as follows:

**Jurisdiction, Legal Basis, Background**

1.      This Court has jurisdiction over the case under 28 U.S.C. §1334 and the standing order of reference. This is a core proceeding.

2.      The statutory predicates for the relief sought herein are Sections 105 and 363 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure.

3.      The Debtor owns and operates a manufacturing facility in Paducah, Kentucky, that manufactures and sells aluminum doors and windows.

4.      The Debtor will select a Stalking Horse Bidder ("Stalking Horse Bidder") for the Assets of Debtor for the purpose of establishing a minimum acceptable bid with which to begin the bidding at the Auction. To the extent the Debtor determines to select a Preliminarily Qualified Bid of a Preliminarily Qualified Bidder as a Stalking Horse Bidder for the Assets, it shall have until October 1, 2010, to do so. The Debtor shall finalize any purchase agreement with a Stalking Horse Bidder by no later than October 1, 2010. Upon

information and belief, the Stalking Horse bid will be a credit bid, plus assumption of post-petition payables, for a total value of $3,700,000.00.

5. The Debtor believes that the Stalking Horse bid will provide a good foundation for an auction, but it wants to solicit the highest and best offer. Other parties have expressed an interest in the Debtor's assets, but have not made concrete offers. Accordingly, to solicit the highest and best offer, the Debtor asks that the Court approve the Bidding Procedures outlined herein.

## Relief Requested

6. In order to facilitate prompt asset dispositions on terms approved by the Court, the Debtor requests entry of an order approving the proposed bidding procedures (the "Bidding Procedures") attached hereto as Exhibit "A."

## Assets Being Sold

7. The "Assets" consist of substantially all of the assets of the Debtor (excluding Chapter 5 claims), as more particularly described as "Purchased Assets" in the Asset Purchase Agreement to be filed by the Stalking Horse Bidder (the "Proposed Buyer").

## Reason for Requesting Auction Sale

8. After great effort, the Debtor has reluctantly concluded that it cannot propose a Plan of Reorganization that would provide any benefit to the unsecured creditors. Although Debtor's business has increased and shows modest profits in some months of operation, the Debtor lacks sufficient cash presently to distribute to its unsecured creditors now or in the future. It believes that a sale of its assets as a going concern will provide the potential for more money to the Debtor's creditors. Other firms have expressed an interest in purchasing the Debtor's assets. A competitive auction is in the best interest of the estate's creditors.

## **Proposed Bidding Procedures**

9.  The Auction shall be held on November 15, 2010, at 10:00 a.m. at the office of Debtor's counsel. Only the Stalking Horse Bidder, the Debtor's secured lender and any party that submits a Qualified Bid (a "Qualified Bidder") may participate in the Auction. The Stalking Horse Bidder is deemed to be a Qualified Bidder for purposes hereof. If the Debtor does not receive a Qualifying Bid by the deadline established herein, the Debtor shall cancel the Auction and accept the Stalking Horse Bid.

A "Qualifying Bid" is a written offer that:

(a) provides that the offeror offers to purchase all or substantially all of the Assets upon terms and conditions substantially as set forth in the Asset Purchase Agreement;

(b) results in a value to the Debtor which, in Debtor's business judgment, is more than the "Minimum Bid," which is the sum of (i) value of the Stalking Horse Bid, (ii) the amount of the Break-up Fee ($50,000.00) and (iii) $50,000.00 (a minimum allowed bid, known as a "Qualifying Bid Amount");

(c) does not provide for any payment to the offeror of a Break-up Fee or, except as offeror's sole remedy in the event of Debtor's material breach under the form of Asset Purchase Agreement, any expense reimbursement, nor does it provide for payment of any similar type of fee or payment;

(d) is accompanied by a duly executed form of Asset Purchase Agreement;

(e) is accompanied by a confidentiality agreement in a form and substance acceptable to the Debtor;

(f) is accompanied by a deposit in the amount of $100,000.00, payable in immediately available funds (the "Deposit") in the form of a wire transfer or a certified check made payable to Mark C. Whitlow, Debtor's counsel, to be held by the Debtor's counsel to secure the Qualifying Bid, which Deposit, subject to these Bidding Procedures, shall be refunded, without interest, to the offeror if the offeror's Qualifying Bid is not accepted by the Debtor as the highest and best offer for the Assets;

(g) identifies with particularity each executory contract and unexpired lease to be assumed and assigned to the offeror at closing;

(h) contains financial and other information sufficient to enable the Debtor, in its business judgment, to evaluate and confirm the offeror's financial wherewithal to consummate the purchase of the Assets, including evidence reasonably satisfactory to the Debtor that the offeror has financial resources available and sufficient to finance the purchase of the Assets, and financial and other information sufficient to provide adequate assurance of future performance under §365 of the Bankruptcy Code;

(i) does not contain any due diligence, financing or other contingencies of any kind;

(j) fully discloses the identity of the offeror or any entity participating in the competing offer;

(k) provides that the offeror consents to the jurisdiction of the Bankruptcy Court; and

(l) provides for a closing of the purchase and sale of the Assets no later than December 20, 2010, provided there is no stay of the Order approving the Sale.

10. The Competing Bids will be evaluated by the Debtor, who will conduct the auction and shall accept the highest and best offer. At auction, the Buyer's offer and Competing Bids may be increased. The Debtor shall reject any bid that is not in conformity with conditions of sale.

11. The entity submitting the bid accepted by the Debtor is the Successful Bidder.

12. The sale of the Assets shall be without representations or warranties of any kind, nature, or description by the Debtor, its agents or its estate except to the extent set forth in the Asset Purchase Agreement of the Successful Bidder as accepted by the Debtor. Except as otherwise provided in such Agreements, all of the Debtor's right, title and interest in and to the Assets shall be sold free and clear of all pledges, liens, security interests,

encumbrances, claims, charges, options and interests thereon and there against in accordance with Section 363 of the Bankruptcy Code, with such Interests to attach to the net proceeds of the sale of the Assets.

13. Each bidder shall be deemed to acknowledge and represent it has had an opportunity to inspect and examine the Assets and to conduct any and all due diligence regarding the Assets prior to making its offer; that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures or, as to the Successful Bidders, the Asset Purchase Agreement.

## **Sales Hearing and Closing**

14. Following a Sale Hearing approving the sale of the Assets to a Successful Bidder, if such Successful Bidder fails to consummate an approved sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Competing Bid, as disclosed at the Sale Hearing, shall be deemed to be the Successful Bid and the Debtor shall be authorized to effectuate such sale without further order of the Bankruptcy Court.

15. Deposits submitted with all Competing Bids shall be held in escrow until the earlier of three (3) business days after all Assets upon which the bidder is bidding have been disposed of pursuant to these Bidding Procedures.

16. Purchase and sale closing of the Assets shall occur no later than December 20, 2010, provided there is no stay of the Order approving the Sale.

## **Bidding Procedures Justified**

17. The Debtor requests that the Court authorize these procedures to ensure certainty and reduce conflict at the Sale Hearing. The procedures are detailed and thorough. The procedures are standard procedures used by debtors to maximize value to the estate.

18. For instance, the minimum bidding increments of $50,000.00 maximize value to the estate by requiring a bidder to bid a sufficient amount to justify the additional effort and time caused by the overbid. By requiring a minimum overbid, the estate accelerates the bidding process.

19. Also, the bid qualification procedures, such as posting a minimum deposit, making the bid in writing, and identical to the Asset Purchase Agreement, reduce the possibility of a speculative bidder who lacks the ability to close. These procedures reduce the possibility of a misunderstanding. They prevent bad-faith sale objections by losing bidders. These procedures are, in the Debtor's business judgment, in the best interests of the Debtor's estate and designed to maximize value.

20. Section 363(b) of the Bankruptcy Code provides that a Debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." However, a Debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business. See, e.g.. Fulton State Bank v. Schipper (In re Schipper), 933 F. 2d 513, 515 (7th Cir. 1991); Committee of Equity Sec. Holders v. Lionel Corp., (In re Lionel Corp.), 722 F.2d 1063, 1070 (2nd Cir. 1993). As

explained above, the Debtor has sound business justifications for obtaining authority to utilize the Bidding Procedures. Accordingly, the Debtor requests entry of an order approving the Bidding Procedures, as proposed.

**Proposed Bid Protections**

21. If a Competing Bid is accepted by the Debtor, the successful bidder has agreed to pay a Break-up Fee to the Proposed Buyer (Stalking Horse Bidder) in the amount of $50,000.00 (the "Break-up Fee") in the event that Proposed Buyer is in compliance with the Asset Purchase Agreement and the applicable provisions of these Bidding Procedures and either (i) the Debtor accepts a higher and better offer for the Assets (other than that of the Proposed Buyer) or (ii) the Bankruptcy Court enters an order approving any counterbid as the highest and best bid (other than a sale of the Assets to the Proposed Buyer). The successful bidder's obligation to pay the Break-up Fee upon the occurrence of the foregoing shall survive the termination of the Asset Purchase Agreement and shall constitute an administrative expense.

**Bid Protections Needed**

22. The Debtor submits that the proposed Bid Procedures and bid protections to Buyer, namely the Break-up Fee ($50,000.00) and minimum bid increments ($50,000.00), are a material and necessary prerequisite for its submission of a Stalking Horse Bid. Without such a process, a Stalking Horse Bidder may be reluctant to make an offer because its offer will be subject to overbid. Pre-approved bidding procedures and Break-up Fees address these concerns, by assuring initial bidders that any auction procedure will be reasonable and that, if the Stalking Horse Bidder is outbid, it will recover its expenses, at a minimum.

23. Historically, bankruptcy courts have approved bidding incentives similar to the proposed bid protections if they represent a proper business judgment of the debtor. See <u>In re 995 Fifth Ave. Associates. L.P.</u>, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking").

24. Bidding incentives encourage potential purchasers to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence, despite the inherent risks and uncertainties of the Chapter 11 process. Historically, bankruptcy courts have approved (or indicated approval of) bidding incentives similar to the ones proposed herein. See <u>Transcom USA Management Co., L.P.</u>, Case No. 01- 35158-H2-11 (S.D. Tex. Order dated Feb. 12, 2002); <u>In re Wintz Co.</u>, 230 F.3d 840, 846 (B.A.P. 8th Cir. 1999) (noting that break-up fees are an acceptable method of increasing bidding in sales of bankruptcy assets); <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993); <u>In re Twenver</u>, 149 B.R. 954, 955 (Bankr. D. Co. 1992) (stating that break-up fees "may encourage a potential purchaser to make an initial bid, which may then be used to attract higher offers"); <u>CRTF Corp. v. Federated Dept. Stores</u> (In re Federated Dept. Stores), 683 F. Supp. 422, 440 (S.D.N.Y. 1988). Here, the Debtor seeks authority to utilize the Bid Procedures in the event that the Stalking Horse is not ultimately the successful bidder. Such procedures will incentivize and compensate Buyer for serving as a Stalking Horse whose bid will be subject to higher and better offers.

25. The $50,000.00 Break-up Fee is reasonable under the circumstances. The Break-up Fee is further justified in view of the efforts that have been made by Buyer and

the risk it will undertake as the Stalking Horse Bidder. Furthermore, the bid protections proposed constitute "a fair and reasonable percentage of the proposed purchase price." In re S.N.A. Nut Company, 186 B.R. at 103. The amount of the Break-up Fee is not far outside the range of what has been approved by other courts dealing with break-up fees (see case citations above). Accordingly, the Debtor submits that the Break-up Fee should be approved as it is (i) fair and reasonable, (ii) customary for transactions of this type in the bankruptcy context, and (iii) justified given the allegations of toxic contamination and associated risks.

## **Conclusion**

26. The Debtor is exercising its business judgment in good faith. After negotiations, it has concluded that the Bidding Procedures are in the best interests of the estate and the bid protections are a good-faith effort to maximize value to the estate. Accordingly, the Debtor requests that the Court authorize the relief after notice and a hearing.

WHEREFORE, PREMISES CONSIDERED, the Debtor requests that the Court enter the attached Order Approving Bidding Procedures and bid protections, and for such other relief as is just.

Respectfully submitted,

WHITLOW, ROBERTS, HOUSTON & STRAUB, PLLC
Attorneys for Debtor


BY  /s/ Mark C. Whitlow
　　　Mark C. Whitlow
　　　mwhitlow@whitlow-law.com
　　　P.O. Box 995
　　　Paducah, KY 42002-0995
　　　270-443-4516

**NOTICE OF ELECTRONIC FILING
AND CERTIFICATE OF SERVICE**

      I hereby certify that on September 27, 2010, I electronically filed the foregoing with the Clerk of the Court, and will send a copy to those parties not receiving electronic notice.

                              BY /s/ Mark C. Whitlow
                                    Mark C. Whitlow